Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000375
28-MAR-2014
11:54 AM

NO. CAAP-11-0000375

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

HOWARD M. NOBUNAGA, Claimant-Appellant, v.
STATE OF HAWAI'I, JUDICIARY DEPARTMENT, Employer-Appellee

LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2005-618 (2-04-02893))

SUMMARY DISPOSITION ORDER
(By: Foley, Presiding Judge, Fujise and Leonard, JJ.)

Claimant-Appellant Howard Michio Nobunaga (**Nobunaga**) appeals from an April 5, 2011 Decision and Order[1] (**Decision and Order**) entered by the Labor and Industrial Relations Appeals Board, State of Hawai'i (**Board**). After a hearing before the Board on August 24, 2009, the Board concluded that: (1) Nobunaga did not sustain a personal injury on March 15, 2004, arising out of and in the course of employment; and (2) Employer-Appellee State of Hawai'i, the Judiciary (**Employer**) had rebutted or overcome the presumption of compensability by substantial evidence.

On appeal, Nobunaga asks this Court to reverse the Board's Decision and Order, challenging the Board's Findings of Fact (**FOFs**) 11, 13, 18, 19, 26, 27, 30-36 and its Conclusion of Law (**COL**), and raising the following points of error:

---

[1]    Roland Q.F. Thom, Chairman (recused), Melanie S. Matsui, Member, and David A. Pendleton, Member, presided.

1.   The Board clearly erred in crediting the opinions of Dr. Grills and Dr. Rogers instead of Dr. Tsushima and Dr. Bernstein;

2.   The Board clearly erred in finding that Nobunaga misperceived the meeting on March 15, 2004 between himself and supervisor, Russell Tellio (**Tellio**), as the record shows the meeting was belittling and demeaning, caused Nobunaga stress that was not self-generated, and the Board clearly erred in not crediting Nobunaga's description of what transpired;

3.   The Board clearly erred in not crediting Nobunaga's testimony and not finding him to be believable, as the record as a whole does not reveal Nobunaga's statements as being inconsistent, and many of the inconsistencies cited by the Board were not in fact inconsistencies;

4.   The Board clearly erred in crediting the testimony of Tellio over Nobunaga, as the record as a whole does not justify this and because Tellio's testimony was actually more inconsistent than Nobunaga's testimony;

5.   The Board clearly erred when it found that Nobunaga's pre-existing Bipolar I Disorder was not aggravated or worsened by the March 15, 2004 meeting and that he did not suffer Adjustment Disorder as a result of the meeting based on the medical and factual evidence presented as interpreted in light of the presumption in Hawaii Revised Statutes (**HRS**) § 386-85(1) and other applicable law; and

6.   The Board erred as a matter of law in finding that the Employer adduced substantial evidence to overcome the presumption of compensability in HRS § 386-85(1), and the Board should have found Nobunaga's Bipolar I Disorder and Adjustment Disorder to be compensable injuries.  The finding of compensability would also necessarily dictate that the Board should decide the unresolved issues of average weekly wage, temporary partial disability, temporary total disability, and entitlement to vocational rehabilitation upon remand.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced, applicable authorities, and the issues raised by the parties, we resolve Nobunaga's points of error as follows:

A.   The Board Did Not Clearly Err in Entering Its Credibility Determinations In Favor of Tellio and Against Nobunaga

It is well established that, in workers' compensation cases, "the credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 92, 34 P.3d 16, 22 (2001).

The Board stated its rationale for not crediting the testimony of Nobunaga in its FOF 30 as:

> The Board does not credit the testimony and statements by Claimant. In particular, but not limited to, the Board finds the Claimant's testimony and statements about the March 15, 2004 incident have been inconsistent and not believable. Further, the medical records indicate that Claimant has a tendency to make overly broad statements, but when questioned directly regarding those statements, he would retract and indicate that those statements were not entirely accurate.
>
> On September 9, 2006, Claimant told Dr. Grills that [Tellio] was singling him out. When asked to describe what he meant, Claimant stated that [Tellio's] negative remarks and behavior. When asked for an example of this, Claimant mentioned that he was made to sign a statement to have his work reviewed by [Tellio]. When asked if this was unusual, Claimant stated that it was not unusual.
>
> With regard to the March 15, 2004 incident, Claimant stated that he found it "demeaning" and that it set him off, but he was not angry. Claimant also stated that the incident was a 30-minute "put down, chewing out session" wherein he was "cussed at" by [Tellio]. However, he later acknowledged that [Tellio] did not actually use curse words, did not yell, and did not threaten him with physical harm, but that [Tellio] spoke in a negative manner.
>
> Claimant described the statements in the letter of understanding as belittling and demeaning because he was already complying. When asked how it was belittling and demeaning if he was already complying, he stated that it was unnecessary.
>
> Claimant stated that he would be sent to an examination to determine if he was "faking," but acknowledged that was just his interpretation, and that his supervisor had not stated that directly.

3

He denied conflicts with prior supervisors. Claimant also only reported a history of panic attacks after the March 15, 2004 meeting, which is contradicted in the medical reports and later in Dr. Grills' report. However, the evidence indicates Claimant had a problem with at least one prior supervisor.

Dr. Grills also noted several inconsistencies. He noted that Claimant informed Dr. Rogers that he did not know the names of any of his medications, but was able to provide the names of the medications to Dr. Grills. Claimant told Dr. Rogers that he was laid off from a law firm because the firm lost several contracts, but informed Dr. Grills that he was let go because one of the partners was grooming a relative rather than Claimant for a partnership position. He informed Dr. Rogers that [Tellio] was a personal friend, but denied that he was a friend to Dr. Grills.

Claimant also informed Dr. Grills that former co-workers would sabotage or back stab him to make work more difficult. As an example, he stated that he wanted to computerize the office, but a co-worker wanted to maintain a manual system. He stated that he had multiple meetings with management and wasted his time meeting with the union who would not help him. He created a policy that outside visitors would not be allowed in the office without proper visitor identification or a volunteer pass. The co-worker supposedly took it personally, but obtained a volunteer pass for her daughter who was helping with the computers.

The foregoing leads the Board to find that there is a high likelihood that Claimant misperceived the March 15, 2004 meeting with [Tellio].

Further, in FOF 33: "The Board credits the testimony of [Tellio] over [Nobunaga]."

Nobunaga argues that FOFs 30 and 33 are clearly erroneous because Tellio admitted to having poor memory, displayed inconsistencies of his own, and displayed profound poor judgment by admitting to bringing a prohibited, unloaded rifle to work. For these reasons, Nobunaga argues that Tellio's "overall testimony should be viewed with skepticism and found untrustworthy."

In response, Employer first argues that this Court "should refuse to review the [Board's] findings of fact pertaining to the credibility of the testimony presented before the [Board]." For this, Employer cites to Igawa v. Koa House Rest. for the proposition that:

It is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

4

Igawa v. Koa House Rest., 97 Hawai'i at 409-10, 38 P.3d at 577-78 (format altered; citations omitted).

We reject Employer's argument that the Board's credibility determination is beyond judicial review. "The issue of credibility is one within the primary responsibility of the Board as the fact finder whose determination will not be disturbed lightly. But where the record reveals no conflict in the evidence or impeachment of any witness, the court will not sustain a finding as to credibility which it is firmly convinced is mistaken." De Victoria v. H & K Contractors, 56 Haw. 552, 559, 545 P.2d 692, 698 (1976) (citations omitted) (holding the Board's FOF that, within the year following the accident, the claimant's back condition had returned to a state which prevailed prior to his work accident as clearly erroneous when such a finding was based solely upon a skeletal, internally contradictory WC-2 Physician's Final Report form). Therefore, although this Court gives a great deal of deference to the Board's credibility determinations, it is not beyond judicial review altogether.

We nevertheless agree with Employer that the Board's noted inconsistencies are supported in the record. Therefore, its credibility determination is not clearly erroneous, despite possible inconsistencies in Tellio's testimony. In reviewing the inconsistencies cited to by the Board, Nobunaga did tell Dr. Grills that Tellio was singling him out by asking him to state in the letter of understanding that he would have his work reviewed by Tellio. However, when asked if it was unusual, Nobunaga responded that it was not unusual.

Additionally, Nobunaga stated that he found the March 15, 2004 incident "demeaning" and that it set him off, but that he was not angry. Although he described the letter of understanding as "belittling and demeaning," when Nobunaga was asked how it was belittling and demeaning when he was already

5

complying with the rules set out in the letter of understanding, he stated that it was because it was "unnecessary."

Also, Nobunaga stated to Dr. Grills that the incident was a 30-minute "put down, chewing out session" wherein he was "cussed at" by Tellio. However, Nobunaga later acknowledged that Tellio did not actually use curse words, did not yell, and did not threaten him with physical harm, but that Tellio spoke in a negative manner.

Moreover, Nobunaga initially asserted that Tellio wanted to send him for an independent medical examination to determine "whether or not [Nobunaga] was faking" what he had. However, when asked explicitly if Tellio actually said that, Nobunaga acknowledged that "this would be my interpretation" and that Tellio did not say it "directly, but he intimated that."

When Dr. Grills asked Nobunaga if he had other conflicts with prior supervisors, Nobunaga replied, "No." However, the record shows and Nobunaga later acknowledges having a conflict with at least one prior supervisor, Clifford Higa, when Nobunaga was working as a deputy attorney general for the State of Hawai'i.

Additionally, Nobunaga did in fact list two different reasons for being laid off from a previous law firm for which he had worked. Specifically, Nobunaga told Dr. Rogers that he was laid off when this law firm lost several contracts. However, when speaking with Dr. Grills, Nobunaga said he was let go because "after five years [the firm] had to decide whether or not to make him partner, and one of the current partners was grooming a relative for that position."

Nobunaga argues on appeal that "[Employer] never presented evidence or let alone suggested [Nobunaga] lied about any of his previous work experience or that both or one of the reasons stated above were untrue." Inconsistent is defined as: "Lacking agreement among parts; not compatible with another fact or claim." BLACK'S LAW DICTIONARY 834 (9th ed. 2009). Therefore,

when Nobunaga was asked the same question and provided differing answers, *i.e.*, not in agreement, the Board did not clearly err in finding the answers to be inconsistent.

Nobunaga told Dr. Rogers that he considered Tellio "my personal friend." Additionally, during his hearing before the Board, Nobunaga stated that he had an "out of the zone kind of feeling," which "shatter[ed his] trust of 28 years." Tellio's testimony confirms that they had been friends for approximately 20 years. However, when Dr. Grills asked Nobunaga if he used to be friends with Tellio, he stated, "no."

In addition to these noted inconsistencies, importantly, to Dr. Grills, Nobunaga "attributed his first panic attack to his meeting with [Tellio] 3/15/04." However, this statement is contradicted by the record. Nobunaga was being treated for Panic Disorder when Dr. Bernstein took over the treatment of Nobunaga from Dr. Jarlais in 2001. Also, as close to the March 15, 2004 incident as February 21, 2004, Nobunaga reported experiencing two panic attacks to Dr. Bernstein.

Due to these inconsistencies in Nobunaga's representations between Dr. Grills and Dr. Rogers, the Board's FOF 30 that "Claimant has a tendency to make overly broad statements, but when questioned directly regarding those statements, he would retract and indicate that those statements were not entirely accurate" is not clearly erroneous. See De Victoria, 56 Haw. at 559-60, 545 P.2d at 698-99 (holding the Board's finding as clearly erroneous when the only basis for the Board's finding is an internally contradictory fill-in-the-blank physician's report form, which was unsupported by other evidence in the record). Therefore, the Board's entry of a negative credibility finding against Nobunaga cannot be said to be clearly erroneous.

After finding in FOF 30 that the testimony and statements by Nobunaga were not credible, the Board went on to credit the testimony of Tellio over Nobunaga in FOF 33. On

appeal, Nobunaga argues that Tellio had inconsistencies in his testimony as well, which makes the Board's finding of credibility clearly erroneous. Specifically, Nobunaga points to Tellio's answer when asked if he had an "independent recollection" of what happened at the March 15, 2004 meeting:

> You know, you got to excuse me because my job was so intense at The Judiciary. And one of the reasons I retired was I felt they were -- Well, I was overwhelmed with what was happening over there.
> My memory may be vague at times. But, you know, now that you give me this memo,[2] I recall I met with Howard. Again, the intent was to be able to communicate with [Nobunaga] better.

Additionally, as support that the Board clearly erred by finding Tellio credible, Nobunaga points to Tellio's "lack of awareness of the rudiments of the [Americans with Disabilities Act], and reckless judgment" when he acknowledged bringing an unloaded rifle to his former workplace, as well as venting.

However, in reviewing the weight of evidence assigned by the Board, this Court is not left with a firm conviction that a mistake has been made. Therefore, the Board's credibility determination with respect to Tellio and Nobunaga are not clearly erroneous.

B.   The Board Did Not Clearly Err in Finding That There Is a High Likelihood That Nobunaga Misperceived the March 15, 2004 Incident

In his second point of error, Nobunaga challenges another portion of FOF 30 in which the Board found: "The foregoing leads the Board to find that there is a high likelihood that Claimant misperceived the March 15, 2004 meeting with [Tellio]." In support of his argument, Nobunaga also challenges FOFs 13 and 27.

---

² This is a March 21, 2005 memorandum prepared by Tellio, which was addressed to Leighton Oshiro, Division Chief of Employer's Workers' Compensation Division. During trial before the Board, the memorandum was used by Employer's counsel to refresh Tellio's memory of the March 15, 2004 incident.

FOF 13 states:

>        Dr. Rogers prepared a Supplemental Report dated March 9, 2005. Dr. Rogers opined that the March 15, 2004 incident did not cause, aggravate, or worsen Claimant's preexisting Bipolar I Condition. Rather, he suffered a recurrence of symptoms of that condition when he misperceived [Tellio's] behavior and interpreted the meeting as harassing, demeaning, and belittling.
>
>        Dr. Rogers opined that if the March 15, 2004 meeting was "stressful," it was only stressful because of Claimant's preexisting psychiatric condition which posed a threat to his job security. Dr. Rogers opined that the behavior of [Tellio] was appropriate.
>
>        Dr. Rogers summarized that Claimant's symptoms following the March 15, 2004 incident represented a recurrence or "relapse" of his preexisting condition,
>
>>              which were not symptomatically different to be a new condition . . . ." Even if the Adjustment Disorder diagnosis were to be accepted, "the root cause of the stress reaction is [Nobunaga's] pre-existing psychiatric condition, and not the 3/15/04 meeting with his supervisor.

FOF 27 states:

>        At trial, Dr. Rogers testified that at the time of his first evaluation of Claimant, Claimant presented with symptoms consistent with a Bipolar I Disorder[.] Dr. Rogers also diagnosed Undifferentiated Somatoform Disorder, because Claimant also presented with "a lot of symptoms that were physical symptoms that were kind of unusual that were beyond the typical realm of bipolar."
>
>        Dr. Rogers testified that "an adjustment disorder is really a last ditch effort to pin a diagnosis on a condition. An adjustment disorder really should not be used if symptoms are better explained by a specific Axis I disorder, such as his bipolar disorder." Further, Claimant's symptoms after the March 15, 2004 meeting with [Tellio] were identical to his symptoms before the meeting.
>
>        Dr. Rogers opined that if [Nobunaga] perceived stress during the March 15, 2004 meeting with [Tellio], it was self generated by Claimant's belief that he would be fired from his job. Dr. Roger's [sic] explained:
>
>>              The nature of a bipolar condition is such that the neurochemical abnormalities in the brain cause everything to be amplified. And I think his thoughts were amplified. His perceptions, therefore, were expansive. ... By all objective standards they were not reflective of accurate reality of what was going on in that meeting.
>
>        Further, Dr. Rogers explained that Bipolar I Disorder is a recurrent disorder, and that its symptoms ebb and flow. Dr. Rogers opined that Claimant's bipolar disorder was not aggravated; Claimant simply experienced a recurrence of the symptoms that he had been experiencing for years.

> Dr. Rogers explained that bipolar symptoms are not triggered by external events, but can make the symptoms more evident. He stated, "the true cause of bipolar disorder is biochemical abnormalities in the central nervous system which is genetically linked. And the way you treat that is to treat those chemicals in the central nervous system to restore those abnormalities as much as possible."

FOFs 13 and 27 are not clearly erroneous, as they accurately reflect what Dr. Rogers stated in his reports, as well as in his testimony during trial. These findings were also supported by Dr. Slomoff's report, which opined that "misperception is a frequent component of psychiatric disorders." Based upon FOFs 13 and 27, as well as the Board's finding that Nobunaga "has a tendency to make overly broad statements [that] . . . were not entirely accurate," the Board's finding in FOF 30 that there is a high likelihood that Nobunaga misperceived the March 15, 2004 incident with Tellio is not clearly erroneous.

C. The Board Did Not Clearly Err in Finding That the Opinions of Drs. Bernstein and Tsushima Are Not Credible

Nobunaga argues that the Board clearly erred in crediting the opinions of Dr. Grills and Dr. Rogers instead of Dr. Tsushima and Dr. Bernstein. Specifically, Nobunaga challenges the Board's FOFs 31, 32, and 35.

FOF 31 states: "Given the foregoing, the Board also does not credit the opinions of Dr. Tsushima and Dr. Bernstein to the extent that they relied primarily and uncritically upon the representation of Claimant to formulate their opinions."

FOF 32 states: "The Board credits the opinions of Dr. Rogers and Dr. Grills."

FOF 35 states: "The Board credits the opinions of Dr. Rogers and Dr. Grills over that of Dr. Tsushima and Dr. Bernstein."

Again, "the credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro, 97 Hawai'i at 92, 34 P.3d at 22.

The Board does not explain why it considers the opinions of Drs. Tsushima and Bernstein to rely "primarily and uncritically" upon the representations of Nobunaga, while finding this not to be the case for Drs. Rogers and Grills. In our review of the record, all four doctors examined Nobunaga for the purpose of evaluating Nobunaga and rendering a medical diagnosis. Like Drs. Rogers and Grills, Drs. Bernstein and Tsushima also reviewed other sources of information in making their evaluation, including Nobunaga's medical history, reports of other doctors, as well as consulted medical treatises to guide their diagnoses. As such, Nobunaga argues that all doctors had "virtually identical access to the same database of medical records, interviews, and each other's reports."

Employer reiterated Dr. Bernstein's evaluation that Nobunaga's symptoms were not substantially different from the symptoms he had experienced prior to the March 15, 2004 incident. Based upon this portion of Dr. Bernstein's evaluation, Employer seems to reason that Dr. Bernstein "cannot be deemed as credible" because "Dr. Bernstein changed his opinion." We assume Employer is hereby referencing the fact that, although Dr. Bernstein stated that Nobunaga's condition was not "substantially different" after the incident, Dr. Bernstein began using the diagnostic code for Adjustment Disorder (309.0) in his clinical notes on February 24, 2005.

Dr. Bernstein's change in diagnosis came after he reviewed Dr. Tsushima's initial medical report, which was dated January 13, 2005. In this report, Dr. Tsushima was the first to diagnose Nobunaga with Adjustment Disorder, in conjunction with Nobunaga's long-standing diagnosis of Bipolar I Disorder. To support the Adjustment Disorder diagnosis, Dr. Tsushima explained that although "[in] early 2004, [Nobunaga] appeared to be improving, and thus he planned to return to work in March[,] . . . he encountered an emotionally distressing incident with his supervisor who criticized the patient for his absence . . . ."

11

As a result, although "[b]y August 2004, the patient was able to improve emotionally and was judged to be about 85% of his usual condition. At this time, there appears to be mild residual from the 03/15/2004 incident, with the patient experiencing anxiety and threat with respect to going back to work."

Dr. Bernstein explained this seemingly late change by stating during his deposition:

> Simply the -- as I recall, it was the difficulty in terms of looking at the whole picture when he was claiming a specific work claim. The bipolar disorder had been preexisting, and there was no question about that. The question was more what -- what the injury was since the previous year. And I had always been treating him for bipolar disorder and would feel very strange if I were to submit a claim to HMSA for an adjustment disorder using medications that were meant for bipolar disorder. So in my head, that is why I continued to use the bipolar disorder code.

Dr. Bernstein subsequently stated that patients who are treated for Adjustment Disorder "would not be using the medications that Mr. Nobunaga is on."

Additionally, Dr. Rogers pointed out, an important portion of Dr. Tsushima's opinion also appears to be internally inconsistent. Specifically, in his March 22, 2005 letter, Dr. Tsushima wrote:

> After his upsetting encounter with Mr. Tellio on his first day back at work, Mr. Nobunaga had an immediate resumption of his rapid heart palpitations, tremulousness, and difficulty concentrating that he had exhibited earlier in his illness. In short, Mr. Nobunaga's psychiatric condition was clearly aggravated and worsened by the 3/15/04 incident at work.

Dr. Rogers criticized this portion of Dr. Tsushima's opinion because a resumption of symptoms exhibited earlier in Nobunaga's illness is contradictory to an aggravation or worsening of the illness.

Therefore, although the record does not shed further light on the Board's reasoning for discrediting the opinions of Drs. Bernstein and Tsushima (that they relied "primarily and uncritically" upon the representations of Nobunaga), the Board's

finding that their opinions are not as reliable as those of Drs. Rogers and Grills is not clearly erroneous. Cf. De Victoria, 56 Haw. at 559-60, 545 P.2d at 698-99 (holding the Board's finding as clearly erroneous when the only basis for the Board's finding was an internally contradictory fill-in-the-blank physician's report form, which was unsupported by other evidence in the record). In reviewing the "reliable, probative, and substantial evidence on the whole record," Igawa, 97 Hawai'i at 406, 38 P.3d at 574, we are not "left with a firm and definite conviction that a mistake has been made." Chung, 63 Haw. at 652, 636 P.2d at 727 (citations and internal quotation marks omitted).

D.    The Board Did Not Clearly Err in Finding That Employer Overcame the Presumption of Work-Relatedness and Did Not Err As to Compensability

Nobunaga argues that: (1) the Board clearly erred when it found that Nobunaga's pre-existing Bipolar I Disorder was not aggravated or worsened by the March 15, 2004 incident and that he did not suffer Adjustment Disorder; and (2) the Board erred as a matter of law in finding that the Employer adduced substantial evidence to overcome the presumption of compensability in HRS § 386-85(1) and should have found Nobunaga's Bipolar I Disorder and Adjustment Disorder to be compensable injuries. In conjunction with these arguments, Nobunaga challenges the Board's FOFs 34, 11, 18, 26, 19, 27, 36 and the Board's COL.

FOF 34 states: "The Board finds that Claimant's preexisting Bipolar I Condition was not aggravated or worsened by the March 15, 2004 incident and that Claimant did not suffer an Adjustment Disorder or other psychiatric diagnosis as a result of that meeting."

As the March 15, 2004 meeting is a singular incident which Nobunaga claims to have caused his injury, when "determining the compensability of injuries 'by accident,'" we must use the unitary or nexus test. Van Ness v. State of Haw., Dep't of Educ., SCWC-11-0000775, slip op. at 39 (Haw. Jan. 23,

2014). Under this test, the Court "considers whether there is a sufficient work connection to bring the accident within the scope of the statute", and "requires the finding of a causal connection between the injury and any incidents or conditions of employment." Id. (citing Tate v. GTE Hawaiian Tel. Co., 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994)).

Under HRS § 386-85 (1993):

> In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary:
> (1) That the claim is for a covered work injury;
> . . .

The supreme court has explained the operation of this presumption as follows:

> In order to overcome the presumption of work-relatedness, the employer bears the initial burden of going forward with the evidence and the burden of persuasion. In other words, the employer must initially introduce substantial evidence that, if true, could rebut the presumption that the injury is work-related. In the workers' compensation context, the term substantial evidence signifies a high quantum of evidence which, at the minimum, must be relevant and credible evidence of a quality and quantity sufficient to justify a conclusion by a reasonable person that an injury or death is not work connected. Once the trier of fact determines that the employer has adduced substantial evidence that could overcome the presumption, it must then weigh that evidence against the evidence presented by the claimant. In so doing, the employer bears the burden of persuasion in which the claimant is given the benefit of the doubt.

Nakamura v. State, 98 Hawai'i 263, 267-68, 47 P.3d 730, 734-35 (2002) (internal citations, quotation marks, and brackets omitted).

As a mixed question of law and fact, this Court reviews the Board's conclusion that an employer has produced substantial evidence to rebut the presumption of work-relatedness under the clearly erroneous standard. Id. at 271, 47 P.3d at 738 (holding that, because the employer adduced substantial evidence to rebut the presumption of work-relatedness attributable to Claimant's claim and giving due deference to the Board's role in evaluating the weight and credibility of the evidence, the Board's decision was not clearly erroneous).

14

In furtherance of his argument that the Board clearly erred when it found that Nobunaga's pre-existing Bipolar I Disorder was not aggravated or worsened by the March 15, 2004 incident and that he did not suffer Adjustment Disorder, Nobunaga points to Akamine for the proposition that the Board confused the difference between medical and legal cause. See Akamine v. Hawaiian Packing & Crating Co., 53 Haw. 406, 410-12, 495 P.2d 1164, 1167-68 (1972). Specifically, Nobunaga cites the following:

> That the testimony of one of the medical witnesses is entitled to very little probative weight issues from the problem involving the distinction which must be made between etiology of heart disease and legal causation. Elucidation on etiology of heart disease is sought from medical experts. The meaning and boundaries of legal causation are established by the legislature and courts; and finding legal causation in a given case is the function of the Board and not that of medical witnesses. To allow a medical expert to give his opinion as to whether legal causation existed in a particular case could lead to an unjust result. For a medical man may give a generalized opinion that there was no connection between an incident at work and a heart attack, and, in his own mind, may mean thereby that a pre-existing pathological condition was the overwhelming factor in bringing about the attack and that the part played by the work was insignificant. But, while it may be sound medically to say that the work did not 'cause' the attack, it may be bad law, because, an [sic] general, existing law treats the slightest factor of aggravation as an adequate 'cause'.

Id. at 410, 495 P.2d at 1167 (citations and some internal quotation marks omitted).

In Akamine, the claimant died of an apparent heart attack while working at his job, which involved unloading, stacking, and "handtrucking" fifteen to twenty pounds of cargo from container trucks. Id. at 415, 495 P.2d at 1165. In support of the employer's denial of the claim, one of the employer's medical experts testified that there was no connection between the claimant's death and the exertion required by his employment, relying heavily on the fact that heart disease originates early in life and that, therefore, the claimant's pre-existing condition was the sole cause of his heart attack and death. Id. at 410-11, 495 P.2d at 1167-68.

The supreme court held that, rather than to focus on the medical cause of the heart attack, the "primary focus of the medical testimony should have been a discussion on whether the employment effort, whether great or little, in any way aggravated Mr. Akamine's heart condition which resulted in his death." Id. at 412, 495 P.2d at 1168. Subsequently, the supreme court clarified its Akamine holding by stating that "a reasonable degree of specificity is required in order for medical opinion evidence to rebut the presumption of compensability." Nakamura, 98 Hawaiʻi at 269, 47 P.3d at 736.

Unlike Akamine, the doctors in this case did not merely opine generally that the injury was not caused by the meeting with Tellio, in a medical sense. Instead, with the exception of Dr. Grills, the doctors were each asked to render their opinion specifically as to whether the meeting with Tellio had "aggravated" Nobunaga's pre-existing Bipolar I Condition, which meets the "reasonable degree of specificity" requirement under Akamine and Nakamura. Although not previously defined in our workers' compensation jurisprudence, "aggravation" means "[t]he fact of being increased in gravity or seriousness." BLACK's LAW DICTIONARY 76 (9th ed. 2009).

Although he was not credited by the Board, Dr. Tsushima stated that he believed that Nobunaga's condition was aggravated by the March 15, 2004 incident and that Nobunaga's Adjustment Disorder was caused or aggravated by the same. However, Dr. Tsushima also opined that Nobunaga experienced a resumption of symptoms exhibited earlier in Nobunaga's illness. Additionally, Dr. Bernstein's opinion was that the meeting caused a "temporary aggravation in his depression" which "lasted approximately a month and stabilized fairly soon."

On the other hand, as the Board found in FOFs 18 and 26, Dr. Slomoff opined that Nobunaga's condition was not aggravated by the meeting with Tellio. Rather, Dr. Slomoff explained that, as he gleaned from the clinical notes of Dr.

Bernstein, Nobunaga had "anticipatory anxiety" about how he would be received upon his return to work. This was confirmed by Dr. Bernstein's February 21, 2004 clinical notes, which provided: "Doing well. Discussed meds. Discussed [return to work] 03/15/04 - 4/04 part time 3 days x 4 hrs. Non-psychotic. Euthymic.[3] 2 panic attacks. Plan: Work on anxiety re return to work." From this, Dr. Slomoff opined that Nobunaga's reaction to the meeting with Tellio was an indication to Nobunaga that he was not ready to return to work, rather than an aggravation caused by Tellio.

As the Board found in FOF 11, Dr. Rogers opined that the March 15, 2004 incident did not "aggravate or worsen" Nobunaga's pre-existing condition because "the events that occurred on 3/15/04 cannot be defined as stressful, by any reasonable criteria." Specifically, Dr. Rogers quoted a psychiatry textbook for the proposition that "it is now generally accepted that environmental conditions contribute more to the timing of an episode than to the underlying vulnerability, which is largely genetic." Citing Rundell & Wise, TEXTBOOK OF CONSULTATION-LIAISON PSYCHIATRY 349 (1996). Dr. Rogers further supported his opinion by noting that the "type, scope, and severity" of Nobunaga's symptoms were not substantially different from his previous Bipolar I Disorder symptoms, which is consistent with Dr. Bernstein's initial evaluation that Nobunaga had "relapsed again."

The supreme court has liberally construed HRS § 386-85 and "requires that all reasonable doubts be resolved in favor of the claimant." Van Ness, slip op. at 33-34 (citations and emphasis omitted). Thus, "if there is reasonable doubt as to whether an injury is work-connected, the . . . statute demands

---

[3]     Dr. Bernstein testified during his deposition that "euthymic" means that the patient is "neither depressed nor manic."

17

that doubt be resolved in favor of the claimant." <u>Akamine</u>, 53 Haw. at 409, 495 P.2d at 1166.

Nobunaga argues that Dr. Slomoff's uncertainty as to whether panic attacks may be exacerbated by external conditions is a "doubt" which should be reasonably found in Nobunaga's favor, resulting in a favorable ruling in work-relatedness of the injury. However, the issue, as defined in <u>Akamine</u>, is whether the pre-existing injury was "aggravated or accelerated" by the work activity. <u>Akamine</u>, 53 Haw. at 413, 495 P.2d at 1169. Here, the reliable medical experts testified that Nobunaga had a "relapse" of a long-standing condition, at best the timing of which may be affected by external conditions. Nobunaga was not on medication for a new condition, he had similar panic attacks prior to the incident, and the type, scope, and severity of his symptoms were not substantially different from his previous Bipolar I Disorder symptoms.

Given the above substantial and thorough opinions of three credible doctors, the Board did not clearly err in finding no aggravation because Nobunaga's condition did not increase in gravity or seriousness.

Additionally, the Board's finding that Nobunaga was not suffering from Adjustment Disorder is not clearly erroneous, as it is supported by substantial evidence. As stated above, Dr. Bernstein did not initially diagnose Nobunaga with Adjustment Disorder, which diagnosis was only added after Dr. Tsushima so opined. Although Dr. Tsushima diagnosed Nobunaga with Adjustment Disorder, as stated above, his opinion was not clearly erroneously discredited by the Board.

The remaining doctors, Drs. Rogers, Slomoff and Grills, found that Nobunaga was not suffering from Adjustment Disorder. Dr. Rogers explained that adjustment disorder is a "last ditch effort to pin a diagnosis on a condition. An adjustment disorder really should not be used if symptoms are better explained by a specific Axis I disorder, such as his bipolar disorder." Dr.

Slomoff concurred when he opined that "I believe that most people would find it unnecessary to suggest an adjustment disorder in addition to bipolar disorder given the circumstances." Similarly, Dr. Grills also found the diagnosis of adjustment disorder "unnecessary."

The doctors that the Board credited agreed that Nobunaga either had a "relapse" or a resumption of the same symptoms he exhibited prior to the March 15, 2004 incident. None of them explained that his pre-existing condition, Bipolar I Disorder, was made worse or was "aggravated" after the meeting with Tellio. Therefore, in light of the "reliable, probative, and substantial evidence on the whole record," Igawa, 97 Hawai'i at 406, 38 P.3d at 574, the Board's FOF 34 is not clearly erroneous.

In light of the Board's findings relevant to its conclusion of no compensability in this case, the Board did not clearly err. Once the "trier of fact determines that the employer has adduced substantial evidence to overcome the presumption, it must weigh the evidence elicited by the employer against the evidence elicited by the claimant." Igawa, 97 Hawai'i at 409, 38 P.3d at 577.

Although there are testimony and medical records that conflict, they were not accorded the same weight by the Board. Thus, this Court's review of the conflicting testimony must be conducted in light of the proper weight assigned by the Board, which we found not to be clearly erroneous, supra. The Board is not "mandated to reconcile conflicting expert testimony in favor of the claimant," because doing so would "eviscerate the well-established rule that the Board's determination of credibility and weight are entitled to deference." Nakamura, 98 Hawai'i at 270, 47 P.3d at 737. The credible medical experts agree that Nobunaga's pre-existing illness was not aggravated or worsened by the meeting with Tellio; thus, the injury cannot be deemed work-related, and the Board did not err in its conclusion that

Nobunaga did not sustain a personal injury arising out of and in the course of employment, under HRS § 386-3.

For these reasons, we affirm the Board's April 5, 2011 Decision and Order.

DATED: Honolulu, Hawaiʻi, March 28, 2014.

On the briefs:

Lowell K.Y. Chun-Hoon
Tatjana Johnson
(King, Nakamura & Chun-Hoon)
for Claimant-Appellant

Scott G. Leong
Shawn L.M. Benton
(Leong Kunihiro Lezy & Benton)
for Employer-Appellee

Presiding Judge

Associate Judge

Associate Judge